```
       IN THE UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF MISSISSIPPI
                 WESTERN DIVISION
```

**CHERRIS NICHOLS, WIFE OF, INDIVIDUALLY
AND ON BEHALF OF THE DECEDENT
DONALD ALTON NICHOLS, AND JAMIE NICHOLS**                        **PLAINTIFFS**

**V.**                                    **CASE NO. 5:11-cv-00010-DCB-JMR**

**BARRY TILLMAN, JR., M.D.**                                       **DEFENDANT**

**OPINION AND ORDER**

This cause is before the Court on Defendant's Motion to Strike the Testimony of the Plaintiffs' Expert Dr. Dan James Fintel [**docket entry. no. 122**]. Therein, the Defendant makes three main arguments as to why Dr. Fintel's testimony should be stricken: (1) he failed to articulate the applicable standard of care, (2) he impermissibly elaborated on the information provided in his expert report, and (3) his testimony was improperly led by Plaintiffs' counsel. Having carefully considered these arguments, the Plaintiffs' response thereto, the deposition transcript in its entirety, applicable statutory and case law, and being otherwise fully advised in the premises, the Court finds and orders as follows:

**1. Standard of Care**

Regarding the standard of care, there are no magical words which must be used to define the applicable standard so long as the expert gives sufficient testimony from which a judge and/or jury could reasonably determine that the expert, in the course of his testimony, has adequately identified the standard of care

applicable to the doctor whose treatment is being questioned. <u>Vanlandingham v. Patton</u>, 35 So. 3d 1242, 1249 (Miss. App. Ct. 2010) ("The supreme court has held that there is no requirement that an expert use magical language in his testimony, 'as long as the import of the testimony is apparent.'"). "Mississippi physicians are bound by nationally-recognized standards of care; they have a duty to employ 'reasonable and ordinary care' in their treatment of patients." <u>Palmer v. Biloxi Reg'l Med. Ctr., Inc.</u>, 564 So. 2d 1346, 1354 (Miss. 1990) (citations omitted). The Mississippi Supreme Court defined this duty as:

> [E]ach physician has a duty to use his or her knowledge and therewith treat through maximum reasonable medical recovery, each patient, with such reasonable diligence, skill, competence, and prudence as are practiced by minimally competent physicians in the same specialty or general field of practice throughout the United States, who have available to them the same general facilities, services, equipment and options.

<u>Id.</u> "It is generally not required that an expert testifying in a medical malpractice case be of the same specialty as the doctor about whom the expert is testifying. 'It is the scope of the witness knowledge and not the artificial classification by title' that should govern the threshold question of admissibility.'" <u>Hubbard v. Wansley</u>, 954 So. 2d 951, 957 (Miss. 2007).

At the outset of his deposition, Dr. Fintel, who, like the Defendant, is a board certified internist,[1] sufficiently

---

[1] There parties have engaged in considerable debate about the purpose and function of a "hospitilist," which, as the Plaintiffs

articulated the standard of care for a 'hospitilist' in response to questioning from Plaintiff's counsel:

> BY MR. WISE: Q Okay. Now, when you talk about defining the standard of care, you're not just putting yourself in the shoes of the physician, you're looking at the minimally qualified doctor in that community; isn't that true?
>
> . . . . (objection omitted)
>
> THE WITNESS: I'm referring to what a trained internist would do faced with the kind of problems that we'll be discussing in today's deposition, a patient with symptoms and signs of congestive heart failure, arrhthymias, and significant systolic left ventricular dysfunction. My answers specifically relate to the actions of a board-trained internist working in the hospital as a hospitalist in Mississippi or in Chicago or in Alaska in dealing with those medical problems.
>
> . . . . (objection omitted)

---

point out, is a relatively new designation. See Robert M. Watcher & Lee Goldman, The Emerging Role of 'Hospitalists' in the American Health Care System, N. Engl. J. Med. (1996) 335;514-17. Stedmans Medical Dictionary (27th ed. 2000) defines hospitilist as:

> 1. A physician whose professional activities are performed chiefly within a hospital, e.g., anesthesiologists, emergency department physicians, intensivists (intensive care specialists), pathologists, and radiologists.
>
> SYN: hospital-based physician.
>
> 2. A primary care physician (not a house officer) who assumes responsibility for the observation and treatment of hospitalized patients and returns them to the care of their private physicians when they are discharged from the hospital.

Citation on Westlaw may be found at STEDMANS 186430. According to a 2007 article, approximately seventy-five percent of hospitalists are general internists. Laurence F. McMahon, Jr., The Hospitalist Movement-Time to Move On, N. Engl. J. Med. (2007) 357;2627-2629.

> BY MR. WISE: Q Let me ask you just one last question, sir. When you're testifying regarding -- regarding the standard of care for a board-certified -- excuse me -for a board-certified internist, is it or is it not a national standard?
>
> A What I'm going to be testifying to today reflects the national standard of how one works up and treats a patient who presents with fluid overload and evidence of systolic left ventricular dysfunction. I'm speaking about the national standard as would apply to any academic or rural or community hospital.
>
> Q And that applies to any doctor working in that hospital, correct?
>
> . . . . (objection omitted)
>
> THE WITNESS: Any internist or specialist in cardiology. I'm not speaking about what a surgeon would do or what, for example, a radiologist would do, which is different, different areas of specialty, but a patient care physician trained in internal medicine.
>
> BY MR. WISE: Q Okay. And then like you just said, is it or it is -- based on those limitations, is it or is it not a national standard?
>
> . . . . (objection omitted)
>
> THE WITNESS: It is a national standard.
>
> BY MR. WISE: Q And that would apply everywhere, including Mississippi?
>
> A Yes, it would.

Fintel Depo. pgs. 19-21. Again towards the end of direct examination, Dr. Fintel testified that the standard of care was breached:

> BY MR. WISE: Q Okay. Was there a breach of the standard of care for a nominally capable internist acting in the role as a hospitalist?

. . . . (objection omitted)

THE WITNESS: Yes, there was.

BY MR. WISE: Q Okay. And does that national standard include a board-certified internist practicing in Mississippi?

. . . . (objection omitted)

THE WITNESS: Yes, it did.

BY MR. WISE: Q Okay. To a degree of medical probability, do you have an opinion as to whether that failure to order a cardiologist on or after September 8th, 2008 to consult with Dr. Tillman and review Dr. -- excuse me -- Mr. Nichols' case affected Mr. Nichols' medical condition?

. . . . (objection omitted)

THE WITNESS: Yes, I do. And my opinion is that the failure to promptly consult a cardiologist at Natchez Hospital at the time of the diagnosis of an abnormal EKG, cardiac arrhthymias, new onset congestive heart failure, and severe systolic left ventricular dysfunction, constituted a breach of the standard of care, a breach so serious that Mr. Nichols was denied the lifesaving modern cardiac treatments that include angioplasty or bypass surgery and more powerful medications to help prevent the myocardial infarction which killed him a month later.

. . . . (objection omitted)

BY MR. WISE: Q Okay. So all the other factors, his high blood pressure, diabetes, and so on, would have been addressed in the course of treatment after referral. Is that true to a degree of medical certainty?

. . . . (objection omitted)

THE WITNESS: Yes.

BY MR. WISE: Q Based on your expertise and training?

A Yes, it would.

Taking the testimony as a whole, particularly in light of the

foregoing statements, the Court finds that Dr. Fintel has sufficiently testified as to the applicable standard of care and therefore denies the Defendant's objections to his testimony on this basis.

### 2. Dr. Fintel's Rule 26(a)(2)(B) Report

Regarding the expert report, the court is aware that there is some degree of variation between early disclosures during the discovery process of the findings and projected testimony of Dr. Fintel as compared with the video deposition testimony which was given on May 10, 2012. Of particular concern to the Court is Dr. Fintel's possible reliance on testimony not disclosed in his expert report, regardless of whether that testimony became available after the expert report was issued. See Fintel Depo. at 22. The Defendant has a continuing obligation to supplement his report. Fed. R. of Civ. P. 26(e). The Court, however, finds that the purpose of the disclosure requirement is not undermined by the Plaintiff's failure to supplement in this particular instance.

The primary purpose of discovery is to allow all parties to be prepared to address issues, oral testimony, and documentary evidence to be produced at trial. Shelak v. White Motor Co., 581 F.2d 1155, 1159 (5th Cir. 1978) ("The rules are designed to narrow and clarify the issues and to give the parties mutual knowledge of all relevant facts, thereby preventing surprise."). A core question is whether the report of the expert, the response to

interrogatories, as well as the deposition, has afforded the party opposite an opportunity to investigate the basis of the opinion in order to prepare a response. In this case, compositely, the report of Dr. Fintel, the discovery responses, together with the deposition testimony, has afforded the Defendant this opportunity.

Moreover, the vast majority of the Defendant's objections to Dr. Fintel's testimony pertain to information and statements that *were* included in the expert report, just not in the exact same wording as stated in the deposition. See generally, Pl.s' Resp. to Def.'s Objections, Ex. A. (setting forth particular statements in the report which could reasonably be interpreted to form the basis for Dr. Fintel's testimony). An expert is not required to read his expert report and is allowed to explain the information contained therein, which is exactly what Dr. Fintel did. See Thompson v. Doane Pet Care Co., 470 F.3d 1201, 1204-05 (6th Cir. 2006). For instance, the fact that Dr. Fintel stated in his deposition that the Defendant should have referred the decedent to a cardiologist within the hospital is a reasonable elaboration of the statement in his expert report that the "proper course of therapy for Mr. Nichols . . . was prompt referral to a cardiologist . . . on 9/08/08." Fintel Report, Ex. 1, pg. 3, lines 1-3, docket entry no. 122-1. Therefore, all Defendant's objections related to Dr. Fintel's failure to disclose certain information in the expert report are denied.

### 3. Leading Questions

There are some objections as to leading.  While it is true in this case and in all other cases that there is some measure of leading, the Court finds that any leading of Dr. Fintel is harmless.  To say it another way, counsel did not suggest to the witness an answer which the witness would not have made but for the leading. Therefore, the deposition testimony will be allowed in its entirety with the exception of the excerpts specified below.

### 4. Sustained Objections

Finally, in light of the Plaintiffs' intention to introduce Dr. Fintel's video-deposition testimony at trial, the Court has considered each individual objection made during the course of the deposition. The following objections will be sustained and the designated lines stricken from the deposition:

1. Page 64.  Lines 5, 6, 7, 8, 9, 10, & 11.
2. Page 65.  Lines 12, 13, 14, 15, 16, & 24.
3. Page 66.  Lines 1, 2, 3, 4, 5, 6, & 7.
4. Page 67.  Lines 16, 17, 18, 19, 20, 21, 22, 23 & 24.
5. Page 68.  Lines 1 through 20.
6. Page 70.  Lines 6 though 24.
7. Page 71.  Lines 1 through 24.
8. Page 90.  Lines 15, 16, 17, 18, 19, 20, 21, 22, 23 & 24.
9. Page 91.  Lines 1, 2, 3, & 4.
10. Page 93.  Lines 21, 22, 23, & 24.

11.  Page 94.  Lines 1, 2 & 3.

12.  Page 94.  Lines 9 through 24.

13.  Page 95.  Lines 1 through 24.

14.  Page 96.  Lines 1 through 7.

15.  Page 105.  Lines 11 through 24.

**SO ORDERED,** this the 29th day of May 2012.

                                                ___/s/ David Bramlette_____

                                                **UNITED STATES DISTRICT JUDGE**